Good morning. Day two in our week of oral argument. For those of you who are not familiar with our traffic light system, you will see that when you're speaking, it'll be on green. When you get to two-minute warning, it'll go to yellow, and then it'll reach red. When you reach red, that is not a sign to move on to the next topic. It's a sign to wrap up the topic that you are on. If we still have questions, we might push you past that, but otherwise, please try to abide by the traffic light system. All right. We are hearing two cases today. First case, Dish Network LLC v. Gaby Fraifer, Telecenter Inc. et al., 24-10223. I'm going to mess up this last name. Deneen Waslick, Your Honor. Okay. Thank you. I see you've got some time for rebuttal, but you have ten minutes, so you may proceed when you are ready. Thank you, Your Honor. I may please the Court. Deneen Waslick for Appellant Gaby Fraifer, Telecenter Inc. and Planet Telecom. Dish's copyright infringement case was built on a house of cards, of broken chains of title, inadmissible evidence, and unqualified expert testimony. Because of this, Dish lacked standing to sue for copyright infringement of the four registered works it alleged. The evidence did not support either prong of the copyright infringement test. Dish did not show ownership of an exclusive right and also failed to provide admissible evidence of the defendants, who merely provided set-top boxes and access to third-party CDNs met the Volitional Act test of making a transmission of Dish's works within the United States. There's no proof of direct infringement, and we believe the Court should reverse. I'm going to start with the ownership slash standing issues because I think those are key here. And we have to really start with the premise that the Copyright Act only protects original works of authorship, not channels. And Dish here, as the sole plaintiff, is at best a licensee of certain channels. There's some dispute as to whether they're even an exclusive licensee in some instances, but at best they're a licensee of channels. We have a declaration, I thought, from NBC saying that the transfer did indeed happen. Well, of the channels, again. But the channels are not the only piece of the puzzle. The channels, there's no proof that the individual works, that those individual channels had exclusive rights to the specific works that are involved, first of all. And second of all, our position is that the, you can't, you can't overcome bad, bad written agreements by just saying, well, we agree to it. In the cases that seem to allow that, like the Imperial case that the appellee relies on, the reason it didn't matter is because the original owner was also a party to the, to the case. Here, Dish is the sole party, and then, and so therefore, as the sole party has the, you know, has the requirement to prove its standing that it actually owns a right that it's trying to enforce here. What did they do with the fact that in the, the magistrate judge in the R&R said that the defendants failed to elaborate on their arguments concerning purported deficiencies in Dish's licensing agreement? Instead, they blanketly asserted that the agreements were materially redacted, were not authenticated, and failed to definitively establish any exclusive rights being transferred to Dish. Thank you, Your Honor. I have two answers to that question. First of all, I think that, that the redactions were material because it was very difficult to look at those agreements and see what was going on. And whether or not that was true at the moment of the summary judgment, once we had the full agreements, which we did at trial, our position as a trial court erred in not reconsidering those issues, you know, we were hamstrung by only having things that were sort of produced at the last minute with these massive redactions. And so we didn't have the information to make a more detailed argument until trial. But also, even that aside, it is still at the... When did you make that argument at summary judgment? They didn't have the information to make that argument at summary judgment. Did you, to have extra time to deal with summary judgment, did you alert the court, hey, we're not ready, we still have more discovery? Yes, there was a motion, and I don't have the exact, I will give it to you in rebuttal, I don't have the exact docket number, but there was an attempt to ask for additional time once we got the summary judgment, the petition's summary judgment materials, and they had affidavits from people who had not been identified before, that we had not had the opportunity to depose, and sought to depose them. And actually were allowed to depose them prior to trial, where we did then discover that the statements that were made in the affidavits were not really supported by personal knowledge, they were just sort of fed to those deponents by dish. And so that is just another reason to show that at trial, the court should have reconsidered those ownership issues. In any event, the, and also those contracts were only disclosed, the unredacted contracts were only disclosed after the summary judgment. So we did not have that information prior to the summary judgment. In addition, Your Honor, I think it also still comes down to the fact that at the end of the day, the dish has to prove that ownership chain in order to have standing to sue, and we don't think that they did that here. Even if you accept the evidence as it was proffered, it doesn't really show that direct chain of ownership. For example, with one of the documents, the Sirat al-Janoub, Episode 15, is one of the four copyrights. It was aired allegedly on NBC1, and then they said, well, also it was aired on NBC Drama. Well, if it was aired on two separate channels at different times, how could either one of those channels have exclusive rights to those individual works? There's a distinct difference between exclusive rights to stream something or transmit something, transmit the channel as a whole versus the individual works, and that's where it breaks down. In addition, Your Honor, we believe that the district court incorrectly applied U.S. law when determining the ownership issues instead of the law of the UAE, which is where these works were created, and that we rely primarily on the Ittartas case out of the Second Circuit and also Sara Jema out of this circuit for that proposition. And Ittartas, I think, is particularly helpful here because in that case, the foreign law was found to apply sort of have a general rule and then have an exception for newspapers, which is what was the issue in that case. And here, we had a similar issue where there's sort of a general rule about joint works versus collective works, but then when there was a specific Article 27 under the foreign statute for audiovisual works, and audiovisual works very clearly say that they are joint works, not collective works, and so we believe that the analysis of the trial court did on that issue was just incorrect as a matter of law. I also want to make sure I address the issue of direct infringement. It's very important to recognize that this is a direct infringement case, not a secondary liability case. And so in order to prove copyright infringement of my clients, who merely provided set-top boxes and access to what are called CDNs, which are kind of sort of things that help the traffic along the Internet superhighway. Well, no, I think you need to break that down a little bit because, as you mentioned in the Aereo case, I mean, it seems very similar. You have someone who is capturing, enhancing, and delivering programs, and the Supreme Court has already found that to constitute performance of some sort. Well, I think there's a huge difference between, factually, between this case and Aereo One, or a few of them. First of all, in Aereo, the court was actually, the defendants were actually physically capturing those, doing a time delay, and then transmitting them out to individuals. Here, there's no sort of physical captioning, capturing on any of, any servers owned by my clients. There are no servers owned by my clients for this regard. All my client did was provide the boxes that the individuals owned, that the individuals could then say, tune me to this Internet page, which was available to anyone who had access to the Internet, and grab those. So I think the, factually, it's a very different situation. Can we agree with the district court that your client was using encoders? Do you use encoders? I don't think we do, Your Honor, because even if you agree that the client was using encoders, the evidence of encoders, which, as you know, we do dispute, but the evidence of use of encoders is all from 2017 and later, and the alleged infringement was in 2016. And, you know, as the technology is changing, obviously, there's no proof that that was the way it was done. If it was done that way in 2017, that that was the way it was done in 2016. So I don't think encoders sort of save the day for DISH in this regard. Well, let's go back to the encoders, because you dispute whether your client was using encoders. How, what is your basis for saying that the district court clearly erred in finding that your client was using encoders, that there are, because there are emails from the defendant's employees, and from Framer himself, saying things like, our encoders to various support teams. Yes, Your Honor. Those, again, that goes to things that happened after 2016, in my view. And so it's not, it's not timely as far as that's concerned. And also, the, you know, the encoders were not, my understanding is that the encoders were not controlled by my clients in any event. I mean, our encoders are sort of being sort of said generally, but it's not something that is being controlled by my client. It was just something that was being, you know, being paid for, or if anything, being paid for by my client. If someone's paying for something, doesn't that make that clear? Potentially, but, but again, I, you know, I say if anything they paid for it, but really it wasn't my client who was paying for it. It was his brother who was not a member of it, and doing things in Canada. It was a separate service. There were a lot of instances where there was a login at your client's offices, correct? Yes, and my understanding is that the testimony was that my client's brother was using the offices, but not employed by, by the client. So it was separate services. So it's not on the tops the login was occurring at your client's offices, right? My understanding is that is correct, Your Honor, but again, that doesn't mean that that person was working for my client, which is what the testimony we think showed, that they were not working for my client. And then finally, Your Honor, I just want to talk to the fact that the, very quickly, that the evidence that was gathered was not even evidence of transmission into the United States. It was the evidence of these particular things were all captured in Switzerland. There's no proof that these same things were actually transmitted into the United States. It is true that some of the computers were used, were physically in Switzerland, but others were in Colorado. I think that we were able to parse the difference between the ones that were the specific four things that were shown were all Swiss. There was a little bit of trying to fudge that, in my opinion, on the part of DISH's expert. But at the end of the day, yes, some things might have been captured in Colorado, but not the ones that were the evidence of this particular infringement. Again, we're talking about four works at four specific times only, not channels as a whole. How do you get around the fact that the Switzerland computers were using a VPN based in Texas? Because it was hit, at the end of the day, it was collected in Switzerland. And also, I think that the proof... Everybody is, when you're using a VPN, it means that everybody is reading the location in Texas. So how is it not capturing transmissions in Texas? Because it's faking the fact that it's in Texas. And the screenshots, when you look at them, they just kind of have a clock that says the time in Texas is this time. That is not really proof that this was happening in Texas in that moment. There was no testimony also about the way a VPN works or how it went in to whether that meant that things actually traveled through Texas. The trial court recognized that Mr. Mishra really couldn't speak to a lot of the technical issues, that he really was not qualified to do so, and that there was no other expert to talk about these technical issues. And lastly, even if you accept the notion that these things went through the United States, which of course I do not, but those logs were still hearsay in the sense that Mr. Mishra didn't capture those things. Some other people did. He gathered them, and we do not believe that those could be considered business records, because they are all records that were created for the purposes of litigation. Let me go back to transmission, performance and transmission. Assume we find that your clients transmitted DISH's copyrighted works using encoders. Do you concede that fact is enough as a matter of law to conclude that your clients transmitted the works under the Copyright Act? I'm sorry, can you repeat the question one more time? Assume we find that your clients transmitted DISH's copyrighted works using encoders. Is that fact enough as a matter of law to conclude that your clients transmitted the works under the Copyright Act? Our position is that the encoders are not enough to prove that it was a transmission, Your Honor, and that's our argument. I assume I'm way out of time, so I apologize. I will happily answer more questions on rebuttal. Thank you, Your Honor. Good morning. So I just want to touch on a few of the points that opposing counsel raised here, starting with the copyright ownership issues. They make the argument that DISH was licensed channels and not works. That's incorrect. NBC's testimony in the district court was that DISH was licensed copyrights in the works, the works airing on the channels, and that is supported by the agreements that were produced in the district court. Turning to what these works are under UAE copyright law, the district court obviously found that they were collective works and that NBC, by having directed the creation of those works, originally acquired the copyrights. I don't think it's disputed that if these are collective works, they cannot be joint works under the UAE copyright law. That was the district court's argument in article one of the statute. Defendants may point to article 27, and they're using article 27 to argue that all audiovisual works have to be joint works. But that's not what article 27 of the UAE copyright law says. What it talks about, in fact, it doesn't talk about joint works or collective works at all. What it talks about is joint authorship, and what it says is that the people identified in article 27, composers, producers, or directors, they could be joint authors in an audiovisual work. But it doesn't say that audiovisual works are joint works, nor does that mean that those individuals' contributions are separable. In fact, if we look at article 25 of the UAE copyright law, which talks about what it means to be a joint author, it says in there that a joint author is a situation where there's a number of people making a work in a way that their contributions cannot be separated. So just because article 27 talks about joint authorship, that doesn't imply that those people identified in article 27 can't make inseparable contributions when we look at that in the UAE. Could your client have sued simply over the use of the STBs? We didn't do it. I would agree that that's probably not enough here. So is it enough if you're, could you claim that this, that it's a problem to be using both STBs and CDNs?  So you're not saying that you have to have encoders. Encoders aren't the make or break of your argument. That's right. Our position is that there was two types of transmissions here, either one of which would be a public performance in violation of our jurisdiction. The next topic I want to make some points about is transfer. District Court found that the transfer of copyrights from NBC to DISH should be examined under United States copyright law. And the reason being is that the court found that the United States has the most significant relationship with that transfer. Those agreements were to be performed in the United States. Ultimately, it was to give copyrights to DISH so that it could show those programs to its customers here in the United States. And those agreements had United States choice of law clauses in them. So the court in finding that U.S. law should apply was correct. Defendant didn't dispute those two facts, that is, that the agreements were to be performed here, that there was U.S. choice of law clauses. What the defendant argued was that some other courts applied foreign law to determine copyright transfer. But in those particular cases, the facts supported the application of foreign law. Foreign law had a more significant relationship to those transfers. Again, that's not the case here. The copyright registration certificate for Saharat Al-Janoub states that O3 Productions was also an author of that work. And there's no contract showing that O3 ever assigned any of its rights to DISH. Yeah. So first point on that is that was an argument that was made in the context of a motion for reconsideration. So we have to consider the procedural aspect in which that was made. So it's the abuse of discretion standard review there on that particular argument. Correct. The argument was based off of the information on the face of the copyright certificate. That copyright registration was identified in the original complaint filed back in 2016. It was produced in discovery in July of 2017. It was filed with our summary judgment in April of 2018. Plenty of opportunities to make that argument. It wasn't until after the summary judgment that that argument was made. What about, where is the contract in which NBC granted exclusive rights in NBC Master to MAP Media? The contract that you're relying on below mentions only NBC3 Kids and NBC Drama, but says nothing about NBC Master. Yeah. So that was again, so I'm happy to respond on two levels. One from a procedural standpoint that was made in the defendant's second motion for reconsideration, the motion that was made at trial. So again, an argument that the defendants could have made sooner. It was based on the agreement between NBC and MAP Media. That agreement was produced to defendants in April of 2018 with our summary judgment motion. But the argument wasn't made until trial closing argument. Okay, so that's just the waiver and abandonment but in terms of the substance. Substance. Yeah. On the substance point on that, our position on that particular, and we don't have testimony from NBC on this issue or MAP Media. The question wasn't raised in the discovery period. We couldn't ask them about that particular issue. But what we do have is we have NBC's declaration at summary judgment saying that exclusive rights were transferred in the works that aired on the NBC Masore channel. That was NBC's testimony. And I understand the annex one to the agreement didn't list that one particular channel. And I think our position on that is it was just inadvertently omitted from that annex. If you look at Dish's agreement with MAP Media. So if you look at the other side, you're working back the other direction. That agreement says that MAP Media had exclusive rights. There's no dispute here between NBC, MAP Media or Dish that exclusive rights in the works on the NBC Masore channel were transferred to Dish. Those other entities are not a party to this lawsuit. So what implications should we draw from that? I mean, I see Imperial as, you know, if you and NBC and these other entities were debating the validity of the transfer, then that makes sense. But in terms of those entities not being a party to the case and still having Frafer challenge the validity of the transfer, I guess I'm just wondering how does that operate when the other entities are not a party to the suit? Right. So I think on that particular point regarding Imperial, we have, so MAP Media is not a party to the case. We have NBC's position. We don't necessarily have MAP Media's. Or maybe we do because ultimately we have MAP Media's agreement with Dish. No, I'm saying we don't have their testimony is what I mean. But we do have their agreement. We have their agreement with Dish. MAP Media's agreement with Dish acknowledges that they have exclusive rights in this and that they were giving them to Dish. They were licensing them to Dish. We also have NBC who is, I don't want to call them a parent company, but MAP Media is an affiliate of NBC. That's stated in NBC's declaration. So in a way, if we have NBC's position, could NBC not speak to what, on behalf of MAP Media in that context? You're asking me? No, I'm, sorry. So I get the point with Imperial. MAP Media is not a party here, but their position on this transfer is sufficiently in the record. To answer your record question, we've got a pretty voluminous record. Yep, we do. And so I'm going to hope that you can point me to something in the record, not in the district court opinion. Okay. Where in the record shows that the defendants were using the CDNs to transmit your client's copyrighted programming? CDNs. So the way we prove that is through two witnesses. We had Pascal Matron. He was the individual who sort of oversaw the monitoring that was done in Switzerland and Colorado. What he did is he identified channels that were transmitted from the CDNs to the set-top boxes. And that was done by monitoring the set-top boxes. That came in through Pascal Matron. NBC essentially took the findings of Matron and said, okay, are my registered works in here somewhere? They were able to look at the sheets that the channels were transmitted and they were able to look at the screenshots that Mr. Matron collected. NBC identified the four registered works in those screenshots. So that is how we know that those registered works are transmitted from defendant CDNs. And you bring me to Matron, so I have a question based on that. What do we do about the fact, as opposing counsel brought up, that Matron's findings did not identify which screenshots were from Switzerland and which were from the Colorado computers? Do the screenshots coming from the Switzerland computers qualify as a violation of the Copyright Act if, technically speaking, the computers themselves were not in the United States? So a few points on that. Number one, the screenshots that correspond with the registered works were all captured in Colorado. This notion that the bulk of the monitoring was done in Switzerland is not correct. The bulk of the monitoring was done in Colorado, and we can see that. We can look at Pascal Matron's trial testimony, and he states in there that the initial monitoring was done in Switzerland. He estimates that in early 2016 it was transitioned to their subsidiary in Colorado, and there was a few one-offs after that where the monitoring was done back in Switzerland. Do we know where the one-offs are? We do, yes, absolutely. They were on July 15, 2016 and May 3, 2017. And if we take Pascal Matron's testimony and we look at the monitoring reports, we can see that the early monitoring, there's a particular set-top box identified. In the later monitoring, there's a different set-top box identified. But all the monitoring when the registered works were captured in April and May of 2016, and those corresponding screenshots, that was all conducted in Colorado. And I do appreciate that the magistrate judge, when he was asked to reconsider this after trial, he had a typo in his order. He did, indeed. He used the word between instead of and. He had a 2016 date and a 2017 date, and he said the monitoring between that time frame was done in Switzerland. But if you look at the context of his statement, it's clear that it's a typo and he meant and, because he says a limited fraction of the monitoring was done in Switzerland. And if you look at the evidence he cites, you will see that what it actually means is that most of the monitoring in question for the bulk of it was done in Colorado. But you also ask about what if. What if that monitoring when the registered works were determined was done in Switzerland? The point that the court made earlier regarding the VPN is spot on. So when Niagara Vision was doing that monitoring in Switzerland, they were using a VPN. That would give them a United States IP address. It would route their Internet traffic through the United States VPN server. For all practical purposes, they are just like any other user of the defendant's server located in the United States. So if they're able to receive those transmissions in Switzerland through their VPN, other users in the United States would also be able to receive them too. The reason Niagara Vision did that was to ensure that what they were doing was accurate. They didn't want to have a situation where they're able to receive something in Switzerland, but users in the U.S. could not receive it because maybe there was a geo block on the content or something like that. But the fact that they used a VPN to make them appear to be in the U.S. and had their Internet traffic routed through a U.S. VPN server, that shows that these works were delivered into the U.S. There's also an argument... So you have not sued under the STBs alone. So your case is turning on both CDN and the encoders. I want to put the encoders aside for a second. How does adding a CDN turn the defendant's conduct into a performance or transmission, considering an arrow case? Don't CDNs just enhance the feed that's already there? Yeah, so the CDN does enhance the feed, but the CDN also is what allows that feed to be delivered to these set-top boxes. If we took the CDN out of the picture here, those transmissions to defendant set-top boxes get cut off. They stop. Those CDNs are what is making that particular transmission here. It really is no different in Aereo. When we look at Aereo, when the court is describing that system, it said that Aereo's system receives programs that have been released to the public and carries them by private channels to additional viewers. That is what was happening here. But the transmission is already coming into the STB. The CDN is enhancing it and making it so that it is a better product. But isn't the streaming already coming into the STBs? It's a completely different pathway, is what it is. It isn't that the CDN is overlaying an existing transmission. It is taking these channels. As the court stated in its opinion, to get to the CDNs, the channels have to be converted through an encoder and added to the CDN. Then from the CDN, it would go to the set-top box. It is taking something and altering the course of it and pushing it through a CDN in order to get to the set-top boxes. It's a new transmission. In the old school days, you have an antenna on top of your TV. The channel is already coming in and you're just getting a better picture. This is a new pathway to deliver these channels to those set-top box users. Just to be clear, you're saying the CDN is enough. You don't need CDN plus encoder, plus all of these other things. The entry point is enough? Our position is that transmission from the CDN to the user is enough. As you know, we do have the encoders here. The court made some very good points on that. That encoder issue, defendants didn't dispute that on the law. That act of sending a channel stream from an encoder to their CDNs is a volitional act and an act of public performance as part of the chain by which that work is ultimately shown. What they are challenging there is the evidence. They are saying that the district court clearly erred in finding that we use these encoders. They challenge a PayPal record and some Whois records, but what they don't challenge is their client's own testimony. Defendant Frayford, his communications with the Verizon CDN, their employee, his communications, his testimony at trial, they had a CDN consultant, Sajid Maksud. His testimony also established that they were using these encoders. That evidence is not contested in this appeal, and as the district court said, that evidence standing alone is enough to show that they use these encoders during the relevant time frame. Defense counsel makes the point that those communications were later. They were not later. They were in 2016. They were right in this infringement window. That is to your and, not between argument point in terms of the time frame? That was actually regarding when the channel marring was done, and in between. Thank you, Mr. Frayford. Looks like you have five minutes remaining. Thank you, Your Honor, and I want to start with the issue of the VPN that you asked about. I want to point the court to the Mitrall testimony, Mitrall's own testimony, as I pointed out on page 20 of the reply brief. His testimony was that the VPN is just obfuscating where the computer is. It's not changing where the computer is and sort of tricks the set-top boxes to thinking they're in the United States. There's no real testimony that talks about where the traffic goes or any of those things. And that just comes back to the whole notion that Mr. Mitrall was not really qualified to talk to the technical aspects of these issues, and we don't really have much evidence about the technical aspects of these issues. As to the issue of Sure. Well, yeah. I think that the general proposition that one can get real experience to become an expert is absolutely true, but I think his own testimony shows that he didn't really understand the technology here, and the trial court basically said as much, that he was not really able to speak to the technology. And so treating him as an expert when he clearly testified that he didn't understand what he was talking about as far as the technology is concerned is an issue. And then the other piece of that is that his testimony about conducting investigations was all taking other people's investigations, the actual technical people's investigations, and, you know, writing a brief about it basically, writing a summary, the same way any lawyer would do. That's not really expertise in the sense that we usually look towards an expert for their help. What he did is he took, you know, third-party things, you know, dressed them up and created a summary. And I will just really quickly address the issue of it being a summary. The dish argues that it's acceptable as a summary under the rule on summaries, but the difference there is that we have case law, and we cited law in our brief that says you can't just dress up hearsay and call it a summary. In the case that they cite where the expert's testimony was admitted, even though it was a summary, the underlying data was not a summary. It was the actual works that were at issue that were just being summarized. This is... How is it not harmless error? Because Matrall, he just could have used the expert report to refresh his memory and testify about each violation, right? Well, I mean, but his... No, because it's not his personal knowledge. He's summarizing other people's work there, and so I don't think that that is, you know, you can't use an expert to create facts. You can use an expert to analyze the effect of those facts, but to create those facts, that has to come from a fact finder. And so our position on that issue is that Matrall's, you know, being veiled in the, you know, in the label of an expert was really a way to just get in hearsay through his impermissible summary, basically. You know, the expert report should not have been admitted, and his testimony was not really supported by any personal knowledge, because he did not do the investigations. He did not... He really did not understand some of the issues in the investigations, as his testimony made clear, and he was just parroting back what other people told him. That is classic hearsay. So I believe that based upon that analysis, that the things that Mr. Matrall said should not be admitted, and it was an abuse of discretion to treat him as an expert and to accept that hearsay testimony to sort of whitewash through him. I do also want to address the point that Dish made about the agreement saying U.S. law applies to the transfers. The issue that I've been arguing about is not so much about the transfers, but about the underlying who owns it. You have to own something to transfer it. And that had to be analyzed under UAE law, and that is why we believe Article 27 of UAE law talking about joint works is applicable to determine who the owner is in order to determine if that person, if the person who alleged to transfer rights to Dish did actually transfer those rights. And so it goes a little deeper than just the owner and this transferee agree, because we don't really have proof that the first person who made the transfer is the owner to begin with. And I think I go back to the notion that you just can't just agree to standing. You can't agree that there's an injury and create jurisdiction in the court. And the court does have a requirement to look at the standing issue every step of the way. And so we believe that the trial court erred in finding that there was direct copyright infringement. If you have any other questions, I'll answer them. Otherwise, I will rest on my briefs. Thank you.